TRAMMELL ET AL. VS. THURMOND ET AL.

A decree is conclusive, only between the parties, or their privies, and in relation to the same subject matter of litigation.

Where a statute, providing for the recording of a deed (not acknowledged by the grantor) upon its being proved by the witnesses, makes no provision for reading such deed, or a copy from the record, in evidence, a certified copy thereof may be read, if not as primary, at least as secondary evidence, on a showing that the original is lost, or not within the control of the party.

When a deed or bill of sale (not acknowledged) is attempted to be proved, so as to authorize its being admitted to record, it is not sufficient for the officer to certify, in general terms, that it was proven: it should appear from the certificate that the witness was sworn, and that he stated that the party, whose name appears to the deed, signed it, or executed it, or acknowledged that he had done so, or some such language, amounting to proof of the execution of the deed. And it must appear that such proof was made by one of the attesting witnesses; unless it is made to appear that the subscribing witnesses are dead or cannot be had.

It is a general rule, that a record not made in accordance with the law relating to the recording of instruments, is incompetent evidence to prove the original: and so, a fortiori, as to a copy thereof.

The rule making deeds admissible in evidence in consequence of their antiquity, is understood to apply to the original deed, and not to the copies. But where the original deed is lost and the subscribing witnesses dead, after the lapse of many years, an

exemplification of an unauthorized record has been admitted as a link in a chain of corroborating circumstances tending to prove the execution of the original.

By an arrangement entered into between Richard Thurmond and Oakley, in the absence and without the consent or knowledge of Thomas Thurmond, for the purpose of putting his slaves out of the reach of his creditors, executions are issued on certain judgments against him, which have been paid, the slaves levied upon, sold, and bought in at nominal prices by Oakley, who conveys them to Richard Thurmond: HELD, That these proceedings were a fraud upon Thomas, and void.

*Appeal from the Circuit Court of Ashley County in Chancery.*

Hon. JOHN C. MURRAY, Circuit Judge.

PIKE & CUMMINS, for appellants.

YELL, for appellee.

Mr. Chief Justice ENGLISH delivered the opinion of the Court.

On the 2d of October, 1850, Henry Trammell and wife, Julia Ann, late Thurmond, James B. Wooldridge and wife, Celia, late Thurmond, William Thurmond, and James Hutchinson and wife, Juda, late Thurmond, filed their bill on the Chancery side of the Ashley Circuit Court, against Thomas J. Thurmond, and Rufus K. Denson and wife, Rebecca, late Thurmond, for the recovery of certain slaves and their hire.

The bill charges, in substance, that on the 8th December, 1826, Richard Thurmond, of the county of Hempstead, in the Territory of Arkansas, made and published his last will, &c., in due form of law; and after his death, which occurred in the year 1827, the will was duly probated and admitted to record, on the 10th March, 1828, before the proper court of said county, where he died. A certified copy of the will, and probate, is exhibited. That by said will, he devised as follows:

*1st.* "I will and bequeath to my wife, Judith Thurmond, all my negroes, young and old, male and female, during her natural lifetime, and as the negroes are now hired out to Allen M. Oak-

ley, I will and bequeath that my wife, Judith, have all the profits arising from the hire of said negroes."

*Thirdly:* At the death of my wife, Judith, I will and bequeath, that all my negroes as before mentioned, and their increase, be enjoyed and go to the proper heirs of my son, Thomas J. Thurmond forever, to be equally divided amongst all the children that he now has, or may have by his wife, Rebecca."

That Judith Thurmond survived her husband, and departed this life about the —— day of ——, 1833 or 1834, having, during her life, held and enjoyed the property given to her by said will.

That the defendant, Thomas J. Thurmond, is the same person mentioned in the will, and that complainants, Julia Ann, Celia, Juda, William Thurmond and the defendant, Rebecca Denson, are all the children which said Thomas J. Thurmond ever had by his wife, Rebecca, who departed this life many years since, &c.

That the following are slaves, or their descendants, owned and possessed by Richard Thurmond at the time of making said will, and at his death, and bequeathed as aforesaid:

*Anthony*, a man, aged about 35 years; *Lona*, a woman, aged about 22 years, and her children, *Dave*, *John* and *Dinah;* *Violet*, a girl, aged about 14 years. The value of the several slaves is alleged.

That the complainants, William, Juda, Celia and Julia Ann, at the time of the death of their grand-mother, Judith Thurmond, were infants of tender years, and totally unable to attend to their affairs, or protect their own interest; and said females intermarried with the parties respectively above mentioned, during their minority, and since their majority have never been discovert.

That immediately after the death of Judith Thurmond, said Thomas J. Thurmond, in violation of the rights of complainants, took possession of the negroes aforesaid, which were then in being, and has, ever since, held them and used the same as his own, with those born since, appropriating to himself their labor, hire,

&c., worth in gross, to the time of filing the bill, $4,000 or $5,000. That said Thomas J. is insolvent, &c., and threatens to run off the slaves, &c. That he had refused to surrender the slaves to complainants, on demand, claiming them as his own property, &c. That Denson and wife were colluding with him to deprive complainants of their interest in the slaves, &c.

Prayer for injunction, Receiver, that an account be taken of the hire of the slaves, and defendant, Thomas J., be required to pay the same, and for partition of the slaves, &c., among the parties entitled thereto, &c.

On the filing of the bill, a temporary injunction was granted, and Receiver appointed, &c.

Thomas J. Thurmond answered the bill at the April term, 1851. He admits that his father, Richard Thurmond, died in Hempstead county about the time stated in the bill. Does not know whether he made his will, as alleged, or not, but if he did, it was without the knowledge or consent of respondent. It was publicly said that he had made such a will, and that it was recorded in the county of Hempstead, but whether the copy attached to the bill, as an exhibit, is a true copy of the will said to have been made by him, respondent does not know. He admits that it purports to be a copy from the record of a will made by his father, but denies the validity of the bequests therein made as against the rights of respondent, or that it was his father's intention, by said will, that the slaves therein referred to, should go to the complainants against the rights of respondent. Admits that his mother, Judith, survived his father, and died about October, 1853. That Wm. Thurmond, the female complainants, and Mrs. Denson are his children, by his wife, Rebecca, and all she ever had, and that she is dead. He denies that after the death of his mother, Judith, he took possession of the negroes mentioned in the will, and avers that he had possession of them, in his own right, long before her death. Admits the ages, and value of the slaves as alleged, and that they are of a stock of negroes that once belonged to his father, Richard Thurmond. Admits that

complainants, William, Juda, Celia and Julia Ann, were infants of tender years, at the time of the death of his mother, Judith, and not capable of attending to their interest, and that the female complainants intermarried as alleged in the bill. That he has had possession of the older slaves ever since, and long before the death of his mother and father, and of the younger ones since their birth, claiming them as his own property, and appro- priating their labor to his own use. Admits that he is in debt, but denies that he is insolvent, or intends to run off the slaves. Admits that he had refused to deliver them up to complainants, and claims them as his own property. Denies collusion between himself and Denson and wife, &c. Does not know whether said will was the real last will of his father or not, but avers that he had no slaves to devise. That his mother had frequently said that his father had made such a will, but that it was done for respondent's benefit, to protect the slaves against his creditors.

That on the 29th of March, 810, while respondent lived with his father and mother in Jackson county, in the State of Geor- gia, and was a minor, his father, the said Richard Thurmond, being possessed of a considerable number of slaves, and out of debt, by deed of gift of that date, in consideration of natural love and affection, conveyed to respondent the following slaves: *Nancy*, and her four children, named *Rhoda, Reuben, Lida* and *Queen;* also four children of *Dinah*, called *Molly, Lew, Elijah* and *Levi;* and the second and third daughters of *Tabbs*, named *Jenny* and *Fanny*, making eleven in number: which deed of gift was attested by two subscribing witnesses, and recorded in said county of Jackson, on the 24th May, 1810. A copy is ex- hibited.

That by deed of gift, bearing date 1st July, 1810, his father also conveyed to respondent, the following slaves: *Old Polly, Dave*, (blacksmith,) *Dinah, Mark* and *Damond;* and about the same time gave the remainder of his slaves to his other son, Roland.

That about the year 1812, Richard Thurmond, with his wife,

and respondent, removed from Georgia, to the county of St. Jenevieve, in the Territory of Missouri, taking with them the slaves conveyed to respondent as above: and on the 8th January, 1814, said Richard duly acknowledged the last mentioned deed of gift before a justice of the peace of said county, and caused the same to be there duly recorded. A copy is exhibited.

That in the year 1818 or 1819, respondent being about 18 years of age, his father and mother removed with him and the slaves aforesaid—all constituting one family—to Arkansas, and located in that portion of it, which afterwards became Hempstead county, where respondent purchased a farm, and settled thereon, with the slaves, his father and mother living with him.

Shortly afterwards, respondent being young, thoughtless and spoiled by his parents, he became reckless, extravagant, got largely in debt, and in bad health, so that by the year 1824, he had mortgaged some of said negroes, and sold others. In the fall of that year, being in bad health, &c., he employed and empowered his friend Bartlett Zachary, to take charge of his estate, manage his negroes, and pay his debts; and in the winter of 1825, respondent went to Pennington's settlement, on the Saline river, (now in Bradley county,) taking but one negro with him.

After respondent left, his debts, amounting to over $3,000, pressing upon Zachary, his property was levied upon, and Zachary, finding it difficult to get along with the debts, in the year 1826, persuaded respondent's father and mother to claim the property as their own, and to take the slaves, and hire them to Oakley and Poston. His father being old, blind and childish, consented, laid claim to the slaves, and on the 8th of December of that year, leased the plantation and all the slaves to Oakley and Poston, for five years and twenty-two days, upon the agreement that they were to cultivate the plantation with the slaves, and out of the proceeds thereof, support respondent's father and mother, pay his debts as fast as the proceeds would admit of, and to prevent the slaves from being sold therefor.

That among the claims that were pressing against the property

of respondent, in the year 1826, were four judgments recovered against him by William Hickman, before a justice of the peace: executions issued thereon to a constable, returned, no property found, and transcripts of the judgments filed in the office of the Clerk of the Circuit Court of Hempstead county. That Oakley and Poston, after entering into the agreement aforesaid, paid off said judgments: but afterwards, upon consultation with Zachary, Oakley, who was Clerk of the Court, concluded that, inasmuch as the expenses would be small, he would issue executions upon the judgments, and by colluding with the sheriff, have all the slaves of respondent levied upon and sold, and by conducting the sale privately, and preventing competition, purchase them in for the amount of the judgments, then convey them to respondent's father and mother, and let them devise them to the children of respondent. Accordingly, on the 20th March, 1827, executions were issued upon the judgments, levied upon the slaves and their increase, then worth between $10,000 and $15,000, which were sold in a secret and fraudulent way, for small sums, purchased by Oakley, and conveyed by him, on the 4th May, 1827, to Richard Thurmond and wife, according to said agreement, (except one slave which Oakley charged for his services,) but still retained possession of the slaves. That the whole proceedings were designed to defraud the creditors of respondent, were null and void, and the slaves, continued, in law, to be his property, notwithstanding such sales, &c. Transcripts of the judgments, executions, conveyances, &c., are exhibited.

That on the 8th December, 1826, in pursuance of said agreement, at the instance of Oakley, and to make the fraud more complete, and in order to quiet the feelings of respondent, when the same should come to his knowledge, Richard Thurmond made the will, if he made it at all, exhibited with the bill.

That all the above transactions occurred while respondent was in Pennington's settlement, on the Saline, without his knowledge. That the country between the place where he was, and Hempstead, was a wilderness, without mail communications, and in

going from one place to the other, persons had to camp out. Respondent being in very bad health, and having left Zachary to manage his affairs, &c., he supposed that all would be done to his satisfaction; but in the spring of 1828, learning that his father was dead, and that his plantation and slaves were in the hands of Oakley, many of his debts unpaid, and every thing badly managed, he returned to Hempstead, &c. Oakley refusing to give up the slaves, &c., respondent went to Louisiana, and got his friend, William Mc D. Pettit, to come, and with him, assume the payment of all his debts, and they had to pay Oakley $2,000, in order to get the slaves, &c., out of his hands. That but for the interposition of Pettit, all the negroes would have been sold to pay respondent's debts, the whole community having become satisfied, that said sales, will &c., were fraudulent. That when respondent got possession of the slaves as aforesaid, he took them to Louisiana, and hired them out.

So, respondent alleges that the slaves in controversy, (being of the stock above referred to,) have always been in his legal possession, except when they were unlawfully held by Oakley, as aforesaid. Respondent always intending to pay his debts, never did recognize or give countenance to the fraudulent sales, &c., so caused by Oakley, &c., and knew nothing of the sales by the sheriff, until long after they had been made.

That while complainants were minors, they, by their next friend, Pennington, brought suit against Mc D. Pettit, in the Chicot Circuit Court, for a portion of the slaves, supposed to have been bequeathed to them in said will, which suit abated by the death of Pennington.

Whereupon, said Mc D. Pettit, in order to quiet the title to the portion of said slaves held by him, on the 12th of November, 1845, filed a bill in said Chicot Circuit Court, against all the complainants and defendants in this bill, and on the 12th of May, 1848, the court decreed, that the sales made by the sheriff of Hempstead county to Oakley, and the said will were fraudulent and void. A transcript of the suit is exhibited. That Zachary

gave his deposition in that case, and has since died, and respondent insists that his deposition, as well as the other depositions, decree, &c., shall be read in evidence in this case.

The cause was heard upon bill, answer, replication, exhibits, depositions, &c., &c., and the court being of the opinion, that the slaves mentioned in the bill, (or their ancestors,) belonged to the defendant, Thomas J. Thurmond, when, before and since Richard Thurmond made his will, dissolved the injunction, ordered the slaves to be restored to him, and dismissed the bill for want of equity, and complainants appealed.

So much of the evidence as is deemed material, will be stated in connection with the points discussed, &c.

It is insisted by the counsel of Thomas J. Thurmond, that the decree rendered by the Chicot Circuit Court, quieting the title of Mc D. Pettit, to a portion of the same stock of slaves now in controversy, is conclusive against the rights of the complainants in this suit.

Pettit's bill, to which the parties to this suit are made defendants, makes, substantially, the same statements that are made in the answer of Thomas J. Thurmond to the bill now before us: and then proceeds to allege, that after Thomas J. Thurmond got the slaves out of the hands of Oakley, and removed them to Louisiana, he and Pettit afterwards removed to Chicot county, in this State, where, in process of time, Thomas J. Thurmond became much embarrassed; judgments were obtained against him, executions issued, levied upon the larger portion of the slaves, which were sold, and Pettit became the purchaser; and the bill prays that his title be quieted, &c. The court decreed that the slaves belonged to Thomas J. Thurmond, under the deeds of gift from his father. That the sale of the slaves, under Hickman's executions, the purchase of them by Oakley, and the transfer of them by him to Richard Thurmond and wife, were fraudulent and void, &c., and that Pettit's title be quieted, &c. It is conceded that the slaves now in controversy in this suit, though of the same stock, are not the same slaves embraced in Pettit's bill

and decree. Thomas J. Thurmond, in his answer to Pettit's bill, admitted the allegations therein made to be true. The answers of the other defendants, if they made any, do not appear in the transcript before us.

The decree in the Chicot Circuit Court, was not between the the same parties, or their privies, that are contesting here, nor were the same slaves the subject matter of litigation in that case, which are in controversy in this; and, therefore, it is well settled, that the decree in Pettit's case, is not conclusive upon the rights of the complainants in this case. 1 *Greenl. Ev.*, sec. 522 *to* 539; *Harvey vs. Richards*, 2 *Gallison* 216; *Baring et al. vs. Fanning et al.*, 1 *Paine's C. C. Rep.* 549; *Hibsham vs. Dulleban*, 4 *Watts* 183; *Duchess of Kingstons's case*, 11 *State Tr.* 261, *opinion by* Chief Justice DeGrey; *Preston vs. Harvey*, 2 *Hen. & Munf.* 55; *Chapman vs. Chapman*, 1 *Munf.* 395; *Bank of the State vs. Robinson et al.*, 13 *Ark. Rep.* 214; *Johnson vs. Emmons*, 2 *Pennington* 747; ± *Phil. Ev.* (*C. & H.*) 165.

Upon a careful examination of all the competent testimony in the cause, which is voluminous, and somewhat in conflict, there can be but little doubt but that Richard Thurmond, about the year 1810, in the State of Georgia, divided his slaves between his two sons, Roland and Thomas J., giving to the latter, the stock from which those in controversy in this suit have descended, or are a part. Independent of the copies of the deeds of gift exhibited with the answer of Thomas J. Thurmond, which are not authenticated so as to be regarded as evidence, the repeated declarations of Richard Thurmond, that he had given the slaves to Thomas J. about the time above stated, and that they belonged to him, are proven by a number of witnesses. These declarations, made prior to the time when his son became embarrassed, and when it does not appear that he had any motive to misrepresent, are of more weight than acts and representations of his, after his son had become largely indebted, and his creditors were seeking to subject the slaves to the payment of his debts. Without, therefore, deeming it necessary to state the

testimony of the several witnesses, we shall assume, as a starting point, that the slaves belonged to Thomas J. Thurmond, prior to the year 1820.

The complainants, for the purpose of proving that Richard Thurmond acquired title to the slaves again, and was the owner of them, when he made his will, and at his death, after filing affidavits, &c., that search had been made for the originals, and they could not be found, &c., read in evidence, transcripts from the records of the Recorder's office of Hempstead county, of the following instruments, subject to objections, as to competency, &c. :

1. A bill of sale, purporting to have been executed by Thomas J. to Richard Thurmond, on the 25th November, 1820, with the certificates attached.

2. A bill of sale, purporting to have been made by Thomas J. to Judith Thurmond, wife to Richard, on the 17th January, 1825, with the certificates attached.

3. Hickman's judgments against Thomas J. Thurmond, the executions that issued thereon, and the returns, the deed from the sheriff to Oakley, and the bill of sale from him to Richard Thurmond and wife, of the slaves purchased by him under the executions, as the property of Thomas J. Thurmond, with the certificates attached.

Other documents were introduced, having some relation to the subject, but the above are the leading instruments upon which complainants have to rely to show title in Richard Thurmond, under whom they claim; and if they fail, their case falls.

No testimony was introduced upon the hearing, to prove the execution of the bills of sale purporting to have been made by Thomas J. Thurmond to Richard and Judith Thurmond. No witness deposed that he ever saw the originals, or knew of their existence. The complainants relied entirely upon the certificates attached to the copies from the record read in evidence. If the copies of the bills of sale, with the certificates attached to them, were competent evidence, they become so by virtue of the *act*

214      CASES IN THE SUPREME COURT

Trammell et al. vs. Thurmond et al.      [JANUARY

*of* 19*th December*, 1846, *Digest*, *p.* 943, and not otherwise. The provisions of the act are as follows:

SEC. 1. "Deeds and instruments of writing for the sale of slaves, or concerning any interest in slaves, may be acknowledged and recorded in the same manner, as conveyances of real estate, and shall have the like effect as evidence in all judicial tribunals in this State."

SEC 2. "All deeds and instruments of writing relating to slaves as aforesaid, heretofore *acknowledged* and recorded, may be used as evidence, with like effect as conveyances of real estate, *duly acknowledged* and recorded."

It does not appear from the certificates attached thereto, that either of the bills of sale was ever acknowledged at all by Thomas J. Thurmond, before any officer whatever.

But let us suppose, without meaning to decide the point, that the Legislature intended to say, in the above act, that deeds *acknowledged or proven*, and recorded in the same manner as conveyances for real estate, shall have like effect, as evidence, &c.

Let us see how deeds for real estate are to be proven, in order to be admitted to record.

It is provided by the *chapter* on CONVEYANCES, contained in *Steel & McCampbell's Digest* of the Laws of the Territory of Arkansas, *page* 132, 133, which was in force, when the attempt appears to have been made to prove the execution of the bills of sale in question, that deeds and conveyances of lands within the Territory, in order to be recorded, shall be proven by one or more of the subscribing witnesses to such deed, before a judge, &c., justice of the Peace, or Clerk, &c. It is further provided, that where the grantors and witnesses of any such deed are deceased, or cannot be had, it shall be lawful for such Judge, Justice, &c., to take the examination of any witness, or witnesses, on oath or affirmation, to prove the handwriting of such deceased witness or witnesses: or where such proof cannot be had, then to prove the handwriting of the grantor or grantors, which shall be certified by the judge or justice before whom such proof shall be made, and such deed or conveyance, being so proved, shall be recorded, &c.

Where the deed is proven by an attesting witness, no provision is made by this statute, as to the form in which the proof shall be taken or certified. Nor is any provision made for reading in evidence a deed proven and recorded under the provisions of the act, without further proof of execution. Nor for reading a certified copy from the record, when the original is lost, or not within the control of the party desiring to use the deed as evidence.

It is usual for the statute which authorizes the recording of deeds, to define their effect as evidence, and prescribe the limitations under which they shall be received, as does our present statute relating to registration, &c. See *Digest, chap. 37 secs.* 26, 27, 28. Where this is not done, as it is not in the territorial statute in question, if the deed is duly acknowledged by the grantor, or proven and recorded, a copy from the record may be read, if not as primary, at least as secondary evidence, on a showing that the original is lost, or not within the control of the party desiring to use it. 4 *Cowen & Hill's notes, Phil. Ev. part* 2, *note* 254, *p.* 460; *Brooks vs. Maybury,* 11 *Wheat.* 78; *Dick et al. vs. Balch et al.,* 8 *Peters Rep.* 31; *Ben et al. vs. Peete,* 2 *Rand.* 539; 11 *Ala. Rep.* 239; 2 *Ib.* 144; 3 *Stewart* 271.

We will now enquire, whether the bills of sale in question were duly proven and admitted to record.

The bill of sale of 25th November, 1820, purports to be a conveyance from Thomas J. to Richard Thurmond, of eight slaves, but naming twenty-eight, for the consideration of $5,000. It is attested by *John M. Bradley* and James Byrneside, as subscribing witnesses. To it is attached the following certificate:

"HEMPSTEAD COUNTY, }
*Township of Rum.* }

This bill of sale, proven and acknowledged by John M. Bradley, before me, on the 16th day of March, 1826.

SILAS RAWLS,
*A Justice of the Peace.*"

Also the certificate of J. B. Gorden, Deputy Clerk (not disclosing the name of his principal,) of the Circuit Court, and *Ex officio* Recorder of Hempstead county, that the instrument was, on the 1st of October, 1826, produced in his office and recorded, &c.

The transcript from the record is authenticated, by the present Clerk, in proper form.

As before remarked, the territorial statute in question does not prescribe the form in which the justice shall certify the probate of a deed when proven before him by one of the subscribing witnesses, as does our present statute. (See *Digest. chap.* 37, *sec.* 19.)

Under a similar statute of Connecticut, it was held that an acknowledgment, &c., should be in writing. That it could not be proven by parol, but must be certified by the officer taking it. *Staunton vs. Button,* 2 *Conn. Rep.* 537; *Hayden vs. Wiscott,* 11 *Ib.* 129; *Pendleton vs. Butt,* 3 *Ib.* 406; 4 *Cowen & Hill's notes, Phil. Ev. part* 2, *p.* 461, *note* 254.

It does not appear from the certificate in this case, that the witness was sworn, nor does it appear what he stated about the execution of the bill of sale. But it is stated in general terms, that the bill of sale was *proven,* &c.

In *Ross vs. McLung,* 6 *Peter's Rep.* 283, the sufficiency of a similar certificate, made under a like statute of North Carolina, was adjudicated upon, and it was held insufficient. In that case, the certificate was in these words: "December Session, 1783. This deed was proven in open court, and ordered to be recorded."

In this case, Chief Justice MARSHALL said, the Clerk had certified to a legal conclusion, in stating that the deed was *proven,* instead of stating the fact, to which the witness testified.

Upon the authority of this case, and cases there cited, we think it but reasonable that it should appear from the certificate, that the witness was sworn, and that he stated that the party, whose name appears to the deed, signed it, or executed it, or acknow-

ledged that he had done so, or some such language, amounting to proof of the execution of the deed. The case of *Ross vs. McLung*, was a stronger one than this, for there, the deed was proven before a court of record; and here, it was done before a justice of the peace, acting in a ministerial capacity, and doing an *ex parte* act *in pais*. In such case, a substantial compliance with what the law requires to be done, ought, we think, affirmatively to appear from the certificate.

While great strictness, in such matters, is not to be required on the one hand, if too much latitude and informality were indulged on the other, it might open a door for fraud, and the admission, to record and in evidence, of deeds never really executed by persons whose names appear to them.

The bill of sale from Thomas J., to his mother Judith Thurmond, purporting to convey to her, for the consideration of $5,000, a portion of the same slaves named in the bill of sale to Richard Thurmond, judging from the similarity of the names, bears date on the 17th day of January, 1825, and is attested by Burrill *Zachary* and *John Cocks*, as subscribing witnesses. To it is attached the following certificate:

"Territory of Arkansas, }
    *Hempstead County.* }

*Bartlett* Zachary, being duly sworn, upon his oath, deposeth and sayeth, that he *seen* Thomas J. Thurmond sign the within and foregoing bill of sale, and heard him acknowledge it to be his hand and seal, act and deed, for the purposes and uses therein mentioned.

BARTLETT ZACHARY.

Sworn to and subscribed before me, this 30th day of June, 1825.

ALLEN M. OAKLEY,
*Justice of the Peace.*"

Also, a certificate of registration of the same date; and an authentication of the transcript by the present clerk, &c.

The above certificate of probate is clearly bad; because the proof was made by a person, other than one of the subscribing witnesses, and there is no showing that they were dead, or could not be had, as expressly required by the statute. See *Gillett vs. Stanley*, 1 *Hill N. Y.* 121; *Jackson ex dem. Kellogg vs. Vickary*, 1 *Wend.* 406; *Jackson ex dem. Wood vs. Harrow*, 11 *John.* 143; *Wilson vs. Ryston* 2 *Ark. Rep.* 315.

It is a general rule, that a record not made in accordance with the law relating to the recording of instruments, is incompetent evidence to prove the original; and so, *a fortiori* as to a copy thereof; for, in such cases, the record amounts to no more than a mere unofficial entry of the officer. 4 *Cowen & Hill's notes, Phil. Ev. part* 2, *p.* 458; *Kerns vs. Swoope,* 2 *Watts.* 75; *Pidge vs. Tylor,* 4 *Mass.* 541; *Morgan vs. Bealle,* 1 *Marsh.* 310; *Womack vs, Wilson, Litt. Sel. Ca.* 292; 1 *Taylor's Rep.* 25; *Miller's Lessee vs. Holt,* 1 *Tenn. Rep.* 111; 7 *Harr. & John.* 124; *Turner. vs. Stip,* 1 *Wash.* 319; 3 *Harr. & McH.* 390; *Mitchell vs. Mitchell.* 3 *Stew. & Port.* 81, 83; *Maxwell vs. Light,* 1 *Call* 117.

The probate of the bills of sale in question being defective, and they not having been acknowledged by the grantor, (*Rowletts vs. Daniel,* 4 *Munf.* 473; *Ben et al. vs. Peete,* 2 *Rand.* 539,) and the complainants having introduced no proof of the execution of the originals, or that the copies introduced had been compared with the originals, (4 *Cowen & Hill's notes, Phil. Ev. part* 2, *p.* 459,) the copies cannot be regarded as competent evidence, though the complainants proved that search had been made for the originals, and they could not be found, &c.

It is insisted by the counsel for the complainants, that the bills of sale were admissible as evidence, in consequence of their antiquity, &c.

Where instruments are more than thirty years old, and are unblemished by any alterations, they are said to prove them-

selves: the bare production thereof is sufficient; the subscribing witnesses being presumed to be dead, &c. But it must appear that the instrument comes from such custody, as to afford a reasonable presumption in favor of its genuineness, and that it is otherwise free from just grounds of suspicion, &c. 1 *Greenl. Ev., sec.* 21, 142, 570.

But one of the bills of sale, that from Thomas J. to Richard Thurmond, of 25th November, 1820, was thirty years old when it was produced as evidence; and moreover, the above rule is understood to apply to the production of the original deeds, and not to copies.

In some instances, where the original deed is lost, and the subscribing witnesses dead, &c., as they perhaps were in this case, after the lapse of many years, an exemplification of an unauthorized record, has been admitted as a link in a chain of corroborating circumstances, tending to prove the execution of the original. See the cases cited in 4 *Cowen & Hill's notes, Phil. Ev., part* 2, *p.* 459.

But in the case before us, the corroborating circumstances are wanting, and the surrounding circumstances tend rather to overturn than to sustain the execution and validity of the originals. It appears from the deposition of F. C. Berry, that Thomas J. Thurmond was under the age of twenty-one years, when the bill of sale of 25th November, 1820, purports to have been made. The bill of sale to Judith Thurmond, purporting to have been made in the year 1825, is for a portion of the same slaves embraced in the former bill of sale. The evidence conduces to show, that after the date of both bills of sale, Thomas J. Thurmond placed the slaves in charge of Bartlett Zachary, to manage for him and pay his debts, and went to Pennington's settlement upon the Saline; and in his absence, Richard Thurmond and Oakley caused the slaves to be sold as the property of Thomas J. Thurmond, under executions; Oakley purchased them, and transferred them to Richard Thurmond and his wife. That when Thomas J. Thurmond returned, he arranged his debts, by the

assistance of Pettit, obtained possession of the slaves, and took them to Louisiana, and from thenceforward held possession of them, except such as he disposed of, or were sold for his debts.

Under all the circumstances in proof, we think that the copies of the bills of sale relied upon by the complainants, cannot be regarded as evidence.

The remaining evidence of title in Richard Thurmond, relied upon by complainants, is the transfer to him and wife, by Oakley, under his purchase at the sheriff's sale.

The testimony proves, beyond a reasonable doubt, that after Thomas J. Thurmond left home, and went to Pennington's settlement, leaving the slaves in the charge of Zachary, being much in debt, and his creditor's pressing their claims, Richard Thurmond and wife claimed the slaves, took them out of the possession of Zachary, leased them to Poston and Oakley; and afterwards, by an arrangement between Oakley and Richard Thurmond and wife, for the purpose of putting the slaves out of the reach of the creditors of Thomas J. Thurmond, the slaves were levied upon by the sheriff, under executions issued upon judgments of Hickman, which had been paid by Oakley, the slaves were all sold for nominal sums, in a private manner, purchased by Oakley, and then transferred to Richard Thurmond and wife. That after this, Oakley retained possession of them under the lease, until Thomas J. Thurmond returned, and by the aid of Pettit, arranged his debts with the creditors, obtained possession of the slaves from Oakley, after the death of Richard Thurmond, and took them to Louisiana, as above stated. The sheriff's sale, &c., occurred in the absence of Thomas J. Thurmond, and the evidence fails to show that he sanctioned the sale, or was a party to the arrangement to defraud his creditors. Under these circumstances, the title thus obtained by Richard Thurmond in fraud of the rights of the creditors of Thomas J. Thurmond, would be invalid, not only as to him, but as to the complainants, who claim under his will. *Digest*, *chap.* 73. These proceedings were not only a fraud upon the creditors of Thomas J. Thurmond, but upon him,

and were void for that reason also. It is needless to cite adjudications to sustain propositions like these, based upon familiar principles of the law, to be found in all the books treating of the subject of fraud.

The complainants proved some declarations of Thomas J. Thurmond, made about the year 1837, to the effect, that the slaves belonged to his children; but these declarations were made at a time, it seems, when he was embarrassed, and perhaps, when executions were out against him. Such declarations do not amount to an estoppel, as held in *Prater adm. vs. Frazier & wife*, 6 *Eng. Rep.* 249.

Upon the whole record, we think the complainants have failed to show title to the slaves in Richard Thurmond, under whose will they claim, as alleged by the bill, and denied by the answer.

There are other questions discussed by the counsel in the cause, but they are of no great magnitude, and the view we have taken of the case, renders it unnecessary to decide them.

The decree of the court below is affirmed.